## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     *Plaintiff*,

     v.                                                            **Civ. No. 23-cv-01112**

$252,402.56 IN FUNDS FROM SANDIA
LABORATORY FEDERAL CREDIT UNION ACCOUNTS
ENDING IN 5175 AND 5162,

11900 HOLLY AVENUE NE, ALBUQUERQUE, NM
87122,

AND,

4508 MAGIC SKY COURT NW, ALBUQUERQUE,
NM, 87114,

     *Defendants-in-rem.*

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, brings this complaint in accordance with

Supplemental Rule G(2) of the Supplemental Rules for Certain Admiralty or Maritime Claims

and Asset Forfeiture Actions, and alleges as follows:

### NATURE OF THE ACTION

1.     This is a civil action to forfeit and condemn to the use and benefit of the United

States of America proceeds of violations of 18 U.S.C. §§ 371, 1035, 1343, and 1347, and

property involved in violations of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957 that is subject to

forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), and 18 U.S.C. § 981(a)(1)(C).

### DEFENDANT *IN REM*

2.     The defendants-*in-rem* consist of the following property:

$252,402.56 in Funds from Sandia Laboratory Federal Credit Union Accounts ending in 5157 and 5162 (hereinafter the "Defendant Funds"), and

The following real properties, with improvements thereon and appurtenances thereto:

11900 Holly Avenue Northeast, Albuquerque, Bernalillo County, New Mexico 87122, more specifically described as follows:

> LOT NUMBERED SIXTEEN (16) IN BLOCK NUMBERED NINETEEN (19), TRACT 2 UNIT 1, NORTH ALBUQUERQUE ACRES, AN ADDITION TO THE CITY OF ALBUQUERQUE, NEW MEXICO, AS THE SAME IS SHOWN AND DESIGNATED ON THE MAP OF SAID ADDITION, FILED IN THE OFFICE OF THE COUNTY CLERK OF BERNALILLO COUNTY, NEW MEXICO ON MARCH 23, 1931. EXCEPTING THEREFROM THE FOLLOWING DESCRIPTION PARCEL 2-6, A CERTAIN PARCEL OR TRACT OF LAND LYING AND BEING SITUATE WITHIN THE SECTION 15, T11N, R4E, NEW MEXICO PRINCIPAL MERIDIAN, COUNTY OF BERNALILLO, STATE OF NEW MEXICO, BEING AND COMPRISING A PORTION OF LOT 16, BLOCK 19, TRACT 2, UNIT 1, NORTH ALBUQUERQUE ACRES (FILED MARCH 23, 1931 BOOK D-130, IN THE OFFICE OF THE COUNTY CLERK OF BERNALILLO COUNTY, NEW MEXICO), BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS, TO WIT:

> BEGINNING AT A POINT 30.00 FEET TO THE RIGHT OF, EASTERLY AND OPPOSITE CENTERLINE SURVEY "E" P.O.T. STATION 14 + 96.46 SAID POINT ALSO BEING ON THE PRESENT (1988) EASTERLY RIGHT-OF-WAY LINE OF LOWELL STREET AND THE PRESENT (1988) SOUTHERLY RIGHT-OF-WAY LINE OF HOLLYWOOD AVENUE, COUNTY OF BERNALILLO, STATE OF NEW MEXICO, POINT OF BEGINNING BEARS S. 78 DEG. 56' 58"E., A DISTANCE OF 2697.66 FEET FROM A CITY OF ALBUQUERQUE SURVEY CONTROL MONUMENT, IDENTIFIED AS 2-D23, HAVING NEW MEXICO STATE PLANE COORDINATES VALUES OF X = 425,956.89, Y = 1,518,445.23, (CENTRAL ZONE);

> THENCE LEAVING SAID POINT OF BEGINNING; THENCE S. 0 DEG. 08' 33" W., A DISTANCE OF 234.17 FEET ALONG SAID PRESENT (1988) EASTERLY RIGHT-OF-WAY LINE OF LOWELL STREET; THENCE S. 89 DEG. 40' 36" E. A DISTANCE OF 4.00 FEET; THENCE N. 0 DEG. 08' 33" E. A DISTANCE OF 209.17 FEET; THENCE N. 45 DEG. 14' 31" E., A DISTANCE OF 35.29 FEET TO A POINT ON THE SAID PRESENT (1988) SOUTHERLY RIGHT-OF-WAY LINE OF HOLLYWOOD AVENUE; THENCE N. 89 DEG. 39' 31" W., A

DISTANCE OF 29.00 FEET ALONG THE SAID PRESENT (1988) SOUTHERLY RIGHT-OF-WAY OF HOLLYWOOD AVENUE TO THE POINT OF BEGINNING.

BERNALILLO COUNTY ASSESSOR PROPERTY DESCRIPTION: LT 16 BLK 19 TRACT 2 UNIT 1 NORTH ALBUQUERQUE ACRES (EXCL W'LY PORT OUT TO R/W) CONT .8578 AC +/-

BERNALILLO COUNTY PARCEL NUMBER: 102206427403740132

(hereinafter "Defendant Real Property 1"),

and,

4508 Magic Sky Court Northwest, Albuquerque, Bernalillo County, New Mexico 87114, more specifically described as follows:

LOT NUMBERED ONE-A-ONE-P-ONE, (1-A-1-P-1), IN BLOCK NUMBERED SEVEN (7), PLAT OF CRYSTAL RIDGE SUBDIVISION, UNIT 3, CITY OF ALBUQUERQUE, BERNALILLO COUNTY, NEW MEXICO, AS THE SAME IS SHOWN AND DESIGNATED ON THE PLAT OF SAID SUBDIVISION, FILED IN THE OFFICE OF THE COUNTY CLERK OF BERNALILLO COUNTY, NEW MEXICO, ON DECEMBER 27, 2010, IN PLAT BOOK 2010C, FOLIO 139.

BERNALILLO COUNTY ASSESSOR PROPERTY DESCRIPTION: LT 1-A-1-P1 BLK 7 PLAT OF LTS 1-A-1-P1 & 1-B-1-P1 BLK 7 CRYSTAL RIDGE SUBD UNIT 3 CONT .4041 AC.

BERNALILLO COUNTY PARCEL NUMBER: 101306604300530921

(hereinafter "Defendant Real Property 2," collectively, with the Defendant Funds and Defendant Real Property 1, referred to as the "Defendant Property").

3.     The Defendant Property is now, and during the pendency of this action will be, in the jurisdiction of this Court.

4.     Upon the filing of this complaint, the United States will arrest the Defendant Funds by execution of a Warrant for Arrest *In Rem* in the District of New Mexico.  The United States will also post notice of the complaint on Defendant Real Property 1 and Defendant Real Property 2 as required by 18 U.S.C. § 985(c)(1)(B).  Posting of notice on Defendant Real

Property 1 and Defendant Real Property 2 establishes *in rem* jurisdiction over the property.  The

United States will also serve notice of the complaint, along with a copy of the complaint, on the

property owner(s) of the Defendant Funds, Defendant Real Property 1, and Defendant Real

Property 2 pursuant to Supplemental Rule G(4)(b) of the Supplemental Rules for Certain

Admiralty or Maritime Claims and Asset Forfeiture Actions, 18 U.S.C. § 985(c)(1)(C), and/or 18

U.S.C. § 985(c)(2).

5.       The United States District Court for the District of New Mexico has subject

matter jurisdiction under 28 U.S.C. §§ 1345, 1355(a), and 1356.

6.       Venue for this civil forfeiture action is proper in this district pursuant to 28 U.S.C.

§§ 1355 and 1395, as acts or omissions giving rise to the forfeiture took place in this district and

the property is found in this district.

## FACTS

### *Krystal Santistevan and LLHHS*

7.       Krystal Santistevan ("SANTISTEVAN") is a manager, the Chief Executive

Officer, and a registered nurse of Labor of Love Home Health Services, LLC, ("LLHHS").

SANTISTEVAN resides at 11900 Holly Avenue NE, Albuquerque, New Mexico 87122, ("the

HOLLY RESIDENCE").

8.       Records obtained from the New Mexico Board of Nursing Primary Source

License Verification ("New Mexico BNPSLV") indicate that Krystal Griego[1] (i.e.,

SANTISTEVAN) is an active registered nurse ("RN"), with license number RN-82009, which

---

[1] Financial records obtained from Sandia Laboratory Federal Credit Union included a copy of
SANTISTEVAN's certificate of marriage.  The certificate of marriage indicates that
SANTISTEVAN's maiden name was Griego.

expires on October 31, 2024.  This RN license status is multistate, which gives SANTISTEVAN

the authority to practice as an RN in New Mexico.

9.      LLHHS maintains an office located at 901 Rio Grande Boulevard NW, Suite

H260, Albuquerque, New Mexico 87104.

10.     LLHHS maintains a website at internet address https://www.laboroflovellc.com.

According to LLHHS's website, LLHHS offers home health care that includes the following

services: skilled nursing, home health aide, occupational therapy, case management, speech

therapy, physical therapy, and personal care attendants.  LLHHS's website also lists an address

of 901 Rio Grande Blvd NW, Suite H260, Albuquerque, NM 87104, and telephone number 505-

903-8703.

11.     Records obtained from New Mexico Secretary of State Corporations and Business

Services include a certificate of organization for LLHHS that was filed on or about January 7,

2014.  The records also indicate that LLHHS's date of organization was on or about January 7,

2014.  The records list a principal business address, as of the date of organization, of 2504

Garfield Ave., Suite 6, Albuquerque, NM 87106.

12.     Records obtained from the Department of Labor ("DOL"), submitted to DOL by

LLHHS, include New Mexico Department of Health Operator's Licenses ("Operator's

Licenses") for LLHHS.  One of these Operator's Licenses expired on July 26, 2014.  The

location listed for LLHHS on that license was "2504 Garfield Ave SE Albuquerque, NM 87106"

and Krystal Griego was listed as the "Administrator/Director/Operator."

13.      Records obtained from DOL also included an Operator's License with an

expiration date of February 29, 2024, with LLHHS's location listed as 901 Rio Grande

Boulevard NW, Suite H260, Albuquerque, New Mexico 87104 and SANTISTEVAN's mother

Jacqueline Jaramillo-Griego ("J. GRIEGO"), listed as the "Administrator/Director/Operator."

14.     Sandia Laboratory Federal Credit Union ("SLFCU") is a "financial institution" as defined in Title 18, United States Code, Section 20.

15.     Records obtained from SLFCU for accounts held by LLHHS ending in 5175 and 5162 indicate that LLHHS is a limited liability company and that Kevin Santistevan, SANTISTEVAN's husband ("K. SANTISTEVAN"), is a manager of LLHHS and an authorized signatory on these accounts.

16.     Records obtained from SLFCU indicate that Jerry Anthony Griego ("A. GRIEGO"), SANTISTEVAN, and K. SANTISTEVAN are authorized signatories for the LLHHS accounts ending in 5175 and 5162.  A. GRIEGO is SANTISTEVAN's father.

17.     LLHHS is technically owned by K. SANTISTEVAN and A. GRIEGO, but SANTISTEVAN is also a true beneficial owner and person in control of LLHHS.

### *LLHHS and Medical Benefits Funded by DOL Under Federal Law*

18.     The Energy Employees Occupational Illness Compensation Program ("EEOICP") is a federally funded program that provides compensation and medical benefits to eligible current or former employees (or eligible survivors) of the Department of Energy ("DOE") and certain of its vendors, contractors, and subcontractors, who were diagnosed with certain diseases as a result of exposure to radiation, beryllium, or silica while employed at covered facilities.

19.     The EEOICP also provides compensation to individuals (or their eligible survivors) awarded benefits by the Department of Justice under Section 5 of the Radiation Exposure Compensation Act ("RECA").  The RECA provides payments to individuals who contracted certain cancers and other diseases as a result of exposures to radiation released during aboveground nuclear weapons tests and/or during employment in uranium mines.  The RECA

has been amended to include uranium mill works and ore transporters.  DOL has primary

responsibility for administering the EEOICP.

20.     Records obtained from DOL that confirms LLHHS is an enrolled medical

provider for beneficiaries of the EEOICP and RECA.

21.     Nursing Assessment Home Visit forms ("NAHV Forms") and Case Management

Forms ("CM Forms"), are submitted by LLHHS to DOL to document home health services

provided pursuant to the EEOICPA and to obtain reimbursement for completed home visits.  The

forms have a note section which allows the nurse to document a summary of the home visit.

22.     DOL policy directs the person providing care to sign the nursing notes, essentially

certifying that the services were provided as described.  If the nursing note is signed by a

transcriber, supervisor, or some other person, DOL policy directs the individual to clearly

indicate this fact in the nursing note.

23.     NAHV and CM forms completed by LLHHS nurses and submitted to DOL do not

indicate that anyone other than the nurses who signed off on the NAHV and CM forms

completed the home visits.

24.     According to the Director of Education and Practice of the New Mexico Board of

Nursing, the New Mexico Board of Nursing does not have specific rules and/or regulations on

how nursing notes must be documented.  The standard practice is for an individual to describe

and sign off on the services the individual writing the notes completed.  If there are two nurses

caring for the same patient, the reasonable standard is that the nurse signing off on the nursing

note be present to witness the care given.  Once a nurse signs off on a nursing note or chart, the

nurse is attesting to the validity of the description of services on the nursing note or chart.  The

New Mexico Board of Nursing does not provide a course on documenting services in nursing notes.

25.     The American Nurses Association "elements of documentation" is taught at university nursing programs in the United States.  Medical facilities accredited by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) have standards for the documentation of care provided by medical personnel.

### *SANTISTEVAN and LLHHS's EEOICP Billing Scheme*

26.     From approximately 2014 to the present, i.e., for approximately as long as LLHHS has been in business, SANTISTEVAN and LLHHS have been fraudulently billing DOL for services not actually rendered in New Mexico.  That is to say, while LLHHS did provide nursing services to individuals in New Mexico pursuant to the EEOICP, a subset of the total claims for payment/reimbursement submitted to DOL by LLHHS for home health services provided under these programs has been based on fraudulent supporting documentation which overbilled DOL for time during which LLHHS personnel were not actually providing home health services.

27.     From approximately 2014 to the present, SANTISTEVAN, LLHHS, and LLHHS employees have purportedly completed home visits for multiple LLHHS patients who reside in different residences during overlapping hours and have submitted documentation indicating that they completed home visits for LLHHS patients residing in New Mexico while they were in fact traveling outside of New Mexico.

28.     From approximately 2014 to the present, SANTISTEVAN instructed employees and contractors of LLHHS to alter the nursing notes to indicate that they spent more time at patients' homes than they had actually spent conducting home health visits.  SANTISTEVAN also instructed employees and contractors of LLHHS to rewrite nursing notes to be more vague

regarding the care provided to patients.  SANTISTEVAN also instructed employees and contractors of LLHHS to only document medical conditions for which LLHHS would be able to bill for home health services.

29.     From approximately 2014 to the present, SANTISTEVAN also directed employees and contractors of LLHHS to use the nursing note narratives to make patients appear sicker than they were in order to justify claims that LLHHS personnel were spending many hours providing care to patients.

30.     From approximately 2014 to the present, SANTISTEVAN and other LLHHS personnel submitted documentation to DOL falsely indicating that they completed home visits for LLHHS patients residing in New Mexico when they were actually traveling outside of New Mexico.

31.     From approximately 2014 to 2022, approximately 2,418 of the NAHV Forms and/or CM Forms LLHHS submitted to DOL indicated either that nurses (1) saw multiple patients during overlapping hours, (2) were traveling such that they could not actually have rendered the services indicated, and/or (3) were working for a different employer at some or all of the time indicated in the NAHV Forms or CM Forms.  DOL paid LLHHS approximately $1,578,205.30 as a result of the false and fraudulent NAHV Forms and/or CM Forms.

32.     DOL records indicate that DOL's Office of Worker's Compensation Programs ("OWCP") will pay providers if bills are submitted (1) within a year after the end of the calendar year in which the services are provided or (2) within a year after the end of the calendar year in which the claim was first accepted, whichever is later.  Due to DOL regulations, LLHHS is allowed to submit claims for reimbursement months after services were purportedly rendered.

33.     LLHHS has consistently submitted delayed billing to DOL.  For example, DOL claims data indicate that DOL received a bill on November 4, 2021, for a date of service rendered on January 16, 2020.

34.     From approximately May 1, 2014, to approximately November 30, 2023, LLHHS SLFCU accounts ending in 5175 and 5162 received approximately $20,774,322.74 in transfers from DOL.

35.     Transfers from the LLHHS accounts to personal accounts belonging to SANTISTEVAN and K. SANTISTEVAN totaled approximately $687,709.71 between May 1, 2014, and November 30, 2023.

36.     From approximately 2015 to 2023, SANTISTEVAN's personal SLFCU accounts ending in 9460 90-01, 9460 00-01, 9460 00-02, and 9460 90-02 took in approximately $598,852.65 from the LLHHS accounts.  SANTISTEVAN's account ending in 9460 90-01 sent approximately $40,000.00 to LLHHS's SLFCU accounts.

37.     Of the proceeds of the billing scheme, approximately $252,402.56 were derived from claims containing fraudulent supporting documentation submitted by LLHHS to DOL between December 17, 2022, and the date of this civil forfeiture complaint.  The United States seized approximately $252,402.56 from the SLFCU accounts ending in 5175 and 5162 pursuant to a seizure warrant issued by a U.S. Magistrate Judge in the District of New Mexico on December 13, 2023.

38.     The figure of $252,402.56 is derived from an analysis of DOL records including 261 claims submitted by LLHHS to DOL via interstate wire between December 17, 2022, and November 2, 2023.  As a result of these claims, the LLHHS checking account ending in 5175 received 36 transfers from DOL.  These transfers occurred between January 1, 2023, and

November 30, 2023 and totaled approximately $2,069,479.61.  The following table summarizes

the transfers:

| CATEGORY | Department of Labor | |
|---|---|---|
| **Year** | **Count of DEPOSITS** | **Sum of DEPOSITS** |
| **2023** | | |
| Jan | 2 | $ 626,950.47 |
| Feb | 2 | $ 184,408.29 |
| Mar | 3 | $ 134,186.48 |
| Apr | 3 | $ 101,653.40 |
| May | 4 | $ 111,607.99 |
| Jun | 2 | $ 46,383.52 |
| Jul | 3 | $ 64,593.45 |
| Aug | 4 | $ 114,462.78 |
| Sep | 4 | $ 124,964.27 |
| Oct | 4 | $ 152,732.20 |
| Nov | 5 | $ 407,536.76 |
| **Grand Total** | **36** | **$ 2,069,479.61** |

39.     At the time of filing of this civil forfeiture complaint, supporting documentation

from DOL is available for 219 of the 261 claims discussed above.  For a subset of the 219

claims, the supporting documentation contains NAHV and/or CM forms where nurses

purportedly provided care to multiple patients during overlapping hours, were traveling, and/or

working for a different employer (i.e., claims for which some of the supporting documentation

was fraudulent).  Claims containing fraudulent supporting documentation resulted in transfers

from DOL to the LLHHS checking account ending in 5175 totaling $193,059.63 between

January 1, 2023 and November 30, 2023,[2] as summarized in the following table.  For the

remaining 42 claims, supporting documentation was not yet available at the time of filing of this

---

[2] That is to say, of the $879,695.06 paid as a result of these 219 claims, payments of $193,059.63
resulted from claims containing fraudulent supporting documentation.  This represents 21.95%
of the total payments associated with the 219 claims.  This "fraud rate" is used herein to estimate
the percentage of payments associated with claims believed to contain fraudulent supporting
documentation in the set of 42 remaining claims, as set out in the corresponding table and
supporting notes.

civil forfeiture complaint, as it has not been provided to the United States by DOL.[3]  On

information and belief, based on a fraud rate of 21.95% derived from the claims that were

reviewed, the additional 42 claims resulted in payments of approximately $59,342.93 derived

from claims containing fraudulent supporting documentation, for a total of approximately

$252,402.56 in payments derived from claims containing fraudulent supporting documentation

between January 1, 2023 and November 30, 2023, corresponding to claims submitted between

December 17, 2022 and November 2, 2023.

Payments for Registered Nurse Procedure Codes Only
YEAR: 2023

| Month Paid | Sum of Paid Amount | Sum of Amount Traced to Nursing Notes | Sum of Amount Traced to Billing Schemes |
|---|---|---|---|
| Jan | $ 401,656.89 | $ 188,831.58 | $ 32,002.43 |
| Feb | $ 136,495.17 | $ 136,092.17 | $ 28,793.25 |
| Mar | $ 91,429.31 | $ 91,353.90 | $ 16,438.80 |
| Apr | $ 30,401.22 | $ 31,357.01 | $ 14,178.37 |
| May | $ 32,501.28 | $ 20,347.64 | $ 4,964.10 |
| Jun | $ 15,646.78 | $ 14,056.62 | $ 10,369.96 |
| Jul | $ 17,507.47 | $ 7,209.61 | $ 2,757.13 |
| Aug | $ 36,011.92 | $ 29,333.20 | $ 4,947.20 |
| Sep | $ 61,595.59 | $ 60,778.10 | $ 25,575.84 |
| Oct | $ 53,650.64 | $ 45,407.83 | $ 5,905.29 |
| Nov | $ 273,200.63 | $ 254,927.40 | $ 47,127.26 |
| **Grand Total** | **$ 1,150,096.90** | **$ 879,695.06** | **$ 193,059.63** |

Dollar Amount of Claims for which Nursing Notes were not provided by DOL:
$      270,401.84
Percentage of Fraudulent Nursing Notes Compared to Reviewed Nursing Notes
21.95%
Extrapolated Dollar Amount to Add: 21.95% x $270,401.84:
$      59,342.93
TOTAL estimated reimbursed false and fraudulent claims 12/17/2022 to 11/30/2023:
**$      252,402.56**

[3] On information and belief, the supporting documentation for these claims was provided by
LLHHS to DOL in order for the claims to be paid, but DOL has not yet been able to identify and
provide all of the supporting documentation and make it available for review.  This civil
forfeiture complaint therefore estimates the portion of payments from DOL to LLHHS associated
with these 42 claims that is derived from fraudulent supporting documentation.  If later
analysis—based on the provision of further documentation from DOL—determines that this
estimate is too high, the United States will seek to amend its complaint and will seek court
approval to release to LLHHS any funds collected in excess of the proceeds of fraudulent claims.

40.     Based on SLFCU account records, savings account 5162 received a single internal transfer of $112,000 from checking account 5175 on March 2, 2023.

### *Money Laundering Scheme*

41.     After obtaining funds from DOL based on claims containing fraudulent supporting documentation, as indicated above, SANTISTEVAN and LLHHS engaged in financial and monetary transactions designed to conceal and disguise the nature, location, source, ownership, or control of proceeds of fraud.  Some of these financial and monetary transactions involved over $10,000 of fraud proceeds.  The fraudulent activities that were the source of these proceeds constitute "specified unlawful activity" as defined by federal law.

42.     Financial and monetary transactions conducted by SANTISTEVAN and LLHHS that were designed to conceal and disguise the nature, location, source, ownership, and control of fraud proceeds included vehicle payments, the purchase of personal property, and payments related to two pieces of real property, Defendant Real Property 1 and Defendant Real Property 2.

43.     More specifically, the purchases of Defendant Real Property 1 and Defendant Real Property 2 were funded by transfers from LLHHS to individual persons, which were fraudulently recorded as "back pay" or "reimbursements" for expenses including vehicle milage and staff housing.  In fact, these transfers contained proceeds of specified unlawful activity and were designed to disguise and conceal the nature, location, source, ownership, or control of those fraud proceeds.

44.     Defendant Real Property 1 was purchased, and the deed was recorded, in SANTISTEVAN's name.  Defendant Real Property 2 was purchased, and the deed was recorded, in the names of J. GRIEGO and A. GRIEGO.

***Defendant Real Property 1 – the Holly Residence***

45.      Records obtained from SLFCU and Caliber Home Loans ("Caliber") contain information showing how funds were transferred from LLHHS to fund the purchase of Defendant Real Property 1.

46.      SLFCU records indicate that SANTISTEVAN and Renee Green ("GREEN"), opened a joint bank account ending in 9460 90-02 on approximately June 22, 2019.  GREEN was employed by LLHHS as a registered nurse from approximately April 2014 to July 2022. SANTISTEVAN was listed as the member/owner of the account.  The SLFCU records also list SANTISTEVAN's employer as Labor of Love Healthcare.  GREEN was listed as a joint owner/authorized signatory for the account.

47.      SLFCU records indicate that approximately three LLHHS checks made payable to GREEN for "back pay" were deposited into the SLFCU account ending in 9460 90-02.  Two of the checks posted on July 12, 2019 and one posted on August 2, 2019.  The memo line on the checks states "Back Pay."  The approximate total amount for the checks was $266,045.00.  This amount of "back pay" is not supported by documentation provided to the United States by DOL.

48.      The transfers from the LLHHS account ending in 5175 to the joint account ending in 9460-90-02, owned by SANTISTEVAN and GREEN, are documented in the chart below:

*Checks from LLHHS 5175 Deposited in Santistevan/Green 9460-90-02*

| Check Date | Deposit Date | Check Number | Amount | Payee | Memo |
|---|---|---|---|---|---|
| 7/10/2019 | 7/12/2019 | 1777 | $143,585.00 | Renee Green | Backpay |
| 7/10/2019 | 7/12/2019 | 1780 | $73,385.00 | Renee Green | Backpay |
| 7/26/2019 | 8/2/2019 | 1784 | $49,075.00 | Renee Green | Backpay |

49.     SLFCU records indicate that SANTISTEVAN also transferred a total of approximately $32,700.00 from SANTISTEVAN's personal accounts ending in 9460 00-01 and 9460 90-01 to the joint bank account ending in 9460 90-02 on August 2, 2019.

50.     SLFCU records indicate that a cashier's check was purchased from the joint account ending in 9460 90-02 on August 2, 2019.  The cashier's check was made payable to J. GRIEGO.  The amount of the cashier's check was $225,368.47.  On the same day, J. GRIEGO opened a new SLFCU account, deposited the cashier's check, and purchased a new cashier's check made payable to Fidelity National Title.  The amount for the new cashier's check was $225,363.47.  The cashier's check stated "gift to Krystal Santistevan from Jacqueline Jaramillo-Griego."

51.     Caliber records included a gift letter associated with the cashier's check provided to Fidelity National Title by J. Griego.  The letter listed SANTISTEVAN as the borrower and J. GRIEGO as the person gifting $262,363.47 towards the purchase of Defendant Real Property 1. The letter indicates that the funds were given to SANTISTEVAN by J. GRIEGO on August 2, 2019.

52.     The current warranty deed recorded in Bernalillo County for Defendant Real Property 1 indicates that SANTISTEVAN is the sole owner of Defendant Real Property 1.

53.     Records obtained from Caliber indicate that, in addition to the cashier's check for $262,363.47 described above, the purchase of Defendant Real Property 1 was funded by a mortgage loan for $484,000.00, for which SANTISTEVAN was listed as the borrower.

54.     The cashier's check provided to Fidelity National Title by J. GRIEGO to partially fund purchase Defendant Real Property 1 included proceeds of SANTISTEVAN and LLHHS's billing scheme to defraud DOL as well as proceeds of property involved in money laundering. More specifically, the negotiation of the cashier's check provided to Fidelity National Title by J.

GRIEGO constituted a monetary transaction involving $10,000 or more derived from specified unlawful activity as defined by federal law.

55.     Both the funds contained in the cashier's check and Defendant Real Property 1 constitute property "involved in" a money laundering transaction as well as property traceable to such property.

56.     Additional mortgage payments toward Defendant Real Property 1, made by SANTESTIVAN, included proceeds of the billing scheme to defraud DOL.

### *Defendant Real Property 2 – the Magic Sky Residence*

57.     Records obtained from SLFCU contain information showing how funds from LLHHS were transferred to fund the purchase of real property located at 4508 Magic Sky Court NW, Albuquerque, New Mexico 87114 (the "Magic Sky Residence," i.e., Defendant Real Property 2).

58.     The records list J. GRIEGO as the member/owner and A. GRIEGO as the joint owner/authorized signatory for SLFCU accounts ending in 6233 00-01 and 6233 90-01.

59.     On March 6, 2022, the balance of account 623 00-01 was $1,044.55.  On March 7, 2022, fourteen (14) check deposits totaling $551,224.80 posted to account 6233 00-01; the remitting account for the checks was LLHHS operating account ending in 5175.  Approximately five LLHHS checks were made payable to A. GRIEGO and nine LLHHS checks were made payable to J. GRIEGO.  The 14 LLHHS checks totaled approximately $551,224.80.  The memo lines on the checks indicate that the checks were for mileage, rent for staff housing, rent for a satellite office, storage, and reimbursement for staff mobile housing.  The checks are summarized in the table below:

*Checks from LLHHS 5175 Deposited in Jaramillo-Griego/Griego 6233 on March 7, 2022*

| Check Date | Check Number | Amount | Payee | Memo |
|---|---|---|---|---|
| 12/31/2021 | 1851 | $25,372.80 | Jacqueline Jaramillo - Griego | Reimbursement - Mileage 01/2016 - 12/2016 |
| 12/31/2021 | 1852 | $20,000.00 | Anthony Griego | Reimbursement - Mileage 01/2016 - 12/2016 |
| 12/31/2021 | 1854 | $25,125.60 | Jacqueline Jaramillo - Griego | Reimbursement - Mileage 01/2017 - 12/2017 |
| 12/31/2021 | 1856 | $15,000.00 | Anthony Griego | Reimbursement - Mileage 01/2017 - 12/2017 |
| 12/31/2021 | 1857 | $27,310.20 | Jacqueline Jaramillo - Griego | Reimbursement - Mileage 01/2018 - 12/2018 |
| 12/31/2021 | 1859 | $15,000.00 | Anthony Griego | Reimbursement - Mileage 01/2018 - 12/2018 |
| 12/31/2021 | 1860 | $24,070.60 | Jacqueline Jaramillo - Griego | Reimbursement - Mileage 01/2019 - 12/2019 |
| 12/31/2021 | 1862 | $15,000.00 | Anthony Griego | Reimbursement - Mileage 01/2019 - 12/2019 |
| 12/31/2021 | 1863 | $25,372.80 | Jacqueline Jaramillo - Griego | Reimbursement - Mileage 01/2020 - 12/2020 |
| 12/31/2021 | 1865 | $15,000.00 | Anthony Griego | Reimbursement - Mileage 01/2020 - 12/2020 |
| 12/31/2021 | 1866 | $25,372.80 | Jacqueline Jaramillo - Griego | Reimbursement - Mileage 01/2021 - 12/2021 |
| 12/31/2021 | 1869 | $90,000.00 | Jacqueline Jaramillo - Griego | Reimbursement - Rent Staff Housing/ DME Storage |
| 12/31/2021 | 1870 | $122,400.00 | Jacqueline Jaramillo - Griego | Reimbursement - Rent Satellite Office/Staff Housing Grants NM |
| 12/31/2021 | 1871 | $106,200.00 | Jacqueline Jaramillo - Griego | Reimbursement - Rent Staff Mobil Housing |

60.     J. GRIEGO and A. GRIEGO were administrative employees of LLHHS and were therefore not responsible for regularly driving to patients' residences to conduct home health visits.  J. GRIEGO purportedly drove to new patients' homes to complete paperwork for commencing care through LLHHS.  A. GRIEGO purportedly delivered supplies and equipment to patients' homes on a periodic basis.  On information and belief, the "mileage" reimbursement

amounts are inconsistent with the mileage that could reasonably be expected to have been driven by J. GRIEGO and A. GRIEGO for these limited purposes.

61.     For reference, the Internal Revenue Service publishes a standard mileage rate for "employees, self-employed individuals, or other taxpayers to use in computing the deductible costs of operating an automobile for business." *available at* https://www.irs.gov/tax-professionals/standard-mileage-rates (last accessed Dec. 16, 2023).  The rate represents the maximum allowable per mile deduction for tax purposes.  If a business elects to pay a higher mileage reimbursement rate, individuals receiving reimbursement must report the difference between the higher rate and the IRS rate as income.  The following table demonstrates calculations of the purported business mileage claimed in the checks paid to J. GRIEGO and A. GRIEGO using the allowable mileage rate for the associated year and the corresponding mileage for the purported mileage reimbursement checks.

| Year | IRS Rate | Amount | Payee | IRS Rate Business Mileage |
|------|----------|--------|-------|---------------------------|
| 2016 | $0.54 | $20,000.00 | Anthony Griego | 37,037.037 |
| 2017 | $0.535 | $15,000.00 | Anthony Griego | 28,037.3832 |
| 2018 | $0.545 | $15,000.00 | Anthony Griego | 27,522.9358 |
| 2019 | $0.58 | $15,000.00 | Anthony Griego | 25,862.069 |
| 2020 | $0.575 | $15,000.00 | Anthony Griego | 26,086.9565 |
| 2016 | $0.54 | $25,372.80 | Jacqueline Jaramillo - Griego | 46,986.6667 |
| 2017 | $0.535 | $25,125.60 | Jacqueline Jaramillo - Griego | 46,963.7383 |
| 2018 | $0.545 | $27,310.20 | Jacqueline Jaramillo - Griego | 50,110.4587 |
| 2019 | $0.58 | $24,070.60 | Jacqueline Jaramillo - Griego | 41,501.0345 |
| 2020 | $0.575 | $25,372.80 | Jacqueline Jaramillo - Griego | 44,126.6087 |
| 2021 | $0.56 | $25,372.80 | Jacqueline Jaramillo - Griego | 45,308.5714 |

62.     SFLCU records for the account ending in 6233 00-01 indicate that on approximately March 9, 2022, a cashier's check made payable to Fidelity National Title Co. was

obtained from the account.  The amount of the cashier's check was $532,483.16.  The memo line states, "Purchase of Home."

63.     Records obtained from Fidelity National Title indicate that, in addition to the cashier's check for $532,483.16, the purchase of Defendant Real Property 2 was funded by a check for $5,000 from J. GRIEGO and A. GRIEGO.  Records obtained from Fidelity National Title indicate that the check for $5,000 and the cashier's check for $532.483.16 together comprised the entire purchase price of Defendant Real Property 2 and that there was no other financing as of the time of closing in approximately March of 2022.

64.     The warranty deed recorded in Bernalillo County for Defendant Real Property 2 lists J. GRIEGO and A. GRIEGO as owners of Defendant Real Property 2 as of March 10, 2022.

65.     The cashier's check provided to Fidelity National Title from the SLFCU account ending in 6233 00-01 on or about March 9, 2022, to fund the purchase Defendant Real Property 2 included proceeds of SANTISTEVAN and LLHHS's billing scheme to defraud DOL as well as proceeds of property involved in money laundering.  More specifically, the negotiation of the cashier's check provided to Fidelity National Title and drawn on the SLFCU account ending in 6233 00-01 constituted a monetary transaction involving $10,000 or more derived from specified unlawful activity as defined by federal law.

66.     Both the funds contained in the cashier's check and Defendant Real Property 2 constitute property "involved in" a money laundering transaction as well as property traceable to such property.

**FIRST CLAIM FOR RELIEF**

67.     The United States incorporates by reference the allegations in paragraphs 1 through 66 as though fully set forth herein.

68.     Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture any property, real or personal, which constitutes or is derived from proceeds traceable to an offense constituting specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7) or conspiracy to commit such offense.  Specified unlawful activity includes violations of 18 U.S.C. § 371, 1035, 1343, and 1347 involving a federal health care offense.

69.     Title 18, United States Code, Section 984(a)(1) defines funds deposited in an account in a financial institution as fungible property, providing as follows: "In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals—(A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property."  Title 18, United States Code, Section 984(a)(2) further provides: "Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section."  Title 18, United States Code, Section 984(b) provides: "No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense."

70.     The Defendant Funds constitute proceeds of violations of 18 U.S.C. §§ 371, 1035, 1343, and 1347 involving federal health care offenses, or conspiracy to commit such offenses (i.e., specified unlawful activity) and are therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).  *See also* 18 U.S.C. §§ 24, 1956(c)(7)(F)

## SECOND CLAIM FOR RELIEF

71.     The United States incorporates by reference the allegations in paragraphs 1 through 66 as though fully set forth herein.

72.     Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

73.     Defendant Real Property 1 was involved in transactions or attempted transactions in violation of 18 U.S.C. §§ 1956 and 1957 or is traceable to such property and is therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF

74.     The United States incorporates by reference the allegations in paragraphs 1 through 66 as though fully set forth herein.

75.     Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

76.     Defendant Real Property 2 was involved in transactions or attempted transactions in violation of 18 U.S.C. §§ 1956 and 1957 or is traceable to such property and is therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE: Plaintiff seeks arrest of Defendant Funds and forfeiture of all Defendant Property to Plaintiff, determination of the validity and priority of claims of the Claimants and

any Unknown Claimants to the Defendant Property, costs, and expenses of seizure and of this

proceeding, and other proper relief.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Submitted Electronically*

TAYLOR F. HARTSTEIN
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, NM 87103
(505) 346-7274